UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO ROBERTSON,

      Petitioner,

                           CASE NO. 2:09-CV-14675
v.                      JUDGE PAUL D. BORMAN
                          MAGISTRATE JUDGE PAUL J. KOMIVES

KENNETH T. McKEE,

      Respondent.[1]

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    D.    *Evidentiary Issues (Claims I-III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
          1.    *Admission of Other Acts and Photographs (Claims I & III)* . . . . . . . . . . . . . . . . . . . . . 10
               a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
               b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
          2.    *Res Gestae Witness and Adverse Inference Instruction (Claim II)* . . . . . . . . . . . . . . . 13
    E.    *Prosecutorial Misconduct (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    F.    *Jury Oath (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    G.    *Habitual Offender Sentencing (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    H.    *Cumulative Error (Claim VII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    I.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . . . 23
          1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    J.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

_____

    [1]By Order entered this date, Kenneth T. McKee has been substituted in place of Lloyd Rapelje as the proper respondent in this action.

I.      <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.     <u>REPORT</u>:

A.      *Procedural History*

1.      Petitioner Antonio Robertson is a state prisoner, currently confined at the Bellamy Creek Correctional Facility in Ionia, Michigan.

2.      On December 1, 2006, petitioner was convicted of torture, MICH. COMP. LAWS § 750.85; kidnapping, MICH. COMP. LAWS § 750.349; assault with intent to do great bodily harm less than murder, MICH. COMP. LAWS § 750.84; and conspiracy to torture, MICH. COMP. LAWS §§ 750.157a, 750.85, following a jury trial in the Macomb County Circuit Court.  On January 18, 2007, he was sentenced as a second habitual offender to concurrent terms of 15-25 years' imprisonment on each of the torture, kidnapping, and conspiracy convictions, and to a term of 5-15 years' imprisonment on the assault conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      DEFENDANT MOVED TO EXCLUDE EVIDENCE OF HIS CRIMINAL HISTORY, IN ADMITTING EVIDENCE THAT TWO OTHER JURISDICTIONS HAD ISSUED ARREST WARRANTS FOR HIS ARREST, THE TRIAL COURT ERRED AND DENIED THE DUE-PROCESS RIGHT TO A FAIR TRIAL.

II.     DEFENDANT WAS DENIED HIS STATUTORY RIGHT TO PRODUCTION OF AN ENDORSED *RES GESTAE* WITNESS, AND HIS DUE-PROCESS RIGHTS TO A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT AND STATE CONSTITUTION, WHERE THE PROSECUTION FAILED TO EXERCISE DUE-DILIGENCE AND THE TRIAL COURT REFUSED TO GIVE THE ADVERSE INFERENCE INSTRUCTION.

III.    DEFENDANT MOVED TO EXCLUDE GRAPHIC PHOTOGRAPHS OF THE COMPLAINANT'S INJURIES BECAUSE THEY SERVED NO PURPOSE OTHER THAN TO INFLAME THE PASSIONS OF THE JURY. IN ADMITTING THE PHOTOGRAPHS, THE TRIAL COURT ERRED AND DENIED THE DUE-PROCESS RIGHT TO A FAIR TRIAL.

IV.    THE PROSECUTOR DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL BY ALLUDING TO A MATTER IN OPENING STATEMENT THAT HE KNEW COULD NOT BE SUPPORTED BY ANY EVIDENCE.

V.    THE TRIAL COURT'S FAILURE TO ADMINISTER AN OATH TO PROSPECTIVE JURORS PRIOR TO *VOIR DIRE* EXAMINATION, AS REQUIRED BY MCR 6.412(B), DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL, MANDATING AUTOMATIC REVERSAL.

VI.    THE TRIAL COURT DID NOT STATE THAT DEFENDANT ROBERTSON'S SENTENCES WERE SUBJECT TO SECOND-OFFENDER ENHANCEMENTS AT SENTENCING. HOWEVER, SEVERAL MONTHS LATER, THE COURT AMENDED THE JUDGMENT TO REFLECT SUCH ENHANCEMENTS. THE HABITUAL, SECOND-OFFENDER SENTENCE ENHANCEMENTS WERE INVALID AND CONSTITUTED DOUBLE JEOPARDY, AND MUST BE STRICKEN.

VII.    THE CUMULATIVE EFFECT OF ERROR REQUIRES THAT DEFENDANT BE GRANTED A NEW TRIAL.

The court of appeals found no merit to petitioner's claims, and affirmed his convictions and sentence. *See People v. Robertson*, No. 276092, 2008 WL 2779899 (Mich. Ct. App. July 17, 1998) (per curiam).

4.    Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Robertson*, 482 Mich. 1187, 758 N.W.2d 573 (2008).

5.    Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on December 1, 2009. As grounds for the writ of habeas corpus, he raises the claims that he raised

3

in the state courts.[2]

6.     Respondent filed his answer on June 4, 2010.  He contends that petitioner's fourth through sixth claims are barred by petitioner's procedural default in the state courts, and that all of the claims are without merit.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the violent assault of Bishop Davis in June 2006.  The evidence adduced at trial is accurately summarized in respondent's Answer:

> In June of 2006, Bishop Davis ("Davis") lived for a period of time with an acquaintance named Roger Brodowski ("Brodowski") (Tr. 11-28-06, 21-23; Tr. 11-29-06, 5). Brodowski resided on Colleen Street in east Warren in the area of Eight Mile and Groesbeck. (Tr. 11-28-06, 23-24).
>
> On June 4, 2006, Davis stopped by Brodowski's house at approximately 12:00 noon. (Tr. 11-28-06, 23). For the next four or five hours, Davis and Brodowski drank alcohol and smoked crack cocaine. (Tr. 11-28-06, 24-25). Much later in the afternoon, a female acquaintance of Brodowski's named Tina Dudley ("Dudley") arrived at the house. (Tr. 11-28-06, 24-26; Tr. 11-29-06, 5-6). Soon thereafter, a group of individuals including Petitioner Antonio Robertson ("Petitioner"); four male individuals known as "Eric," "Keith", "Polo," and "Boss Man"; and a female individual came by Brodowski's house. (Tr. 11-28-06, 26-30; Tr. 11-29-06, 6-7). Davis had been acquainted with these individuals for a few months. (Tr. 11-28-06, 27-30). On that day, he knew Petitioner only as "Yayo." (Tr. 11-28-06, 27).
>
> Later in the evening, Davis was standing near the front door when he saw "a car coming down the street flashing a light." (Tr. 11-28-06, 32-33). Boss Man also stood by the front door as the car approached the house. (Tr. 11-28-06, 34). The car turned out to be a police vehicle. (Tr. 11-28-06, 34). The police vehicle stopped between Brodowski's house and the adjacent house. (Tr. 11-28-06, 35). As Davis turned around and walked back into the house, Petitioner and his companions "scattered" throughout the house. (Tr. 11-28-06, 35-36). Davis walked to Brodowski's bedroom and told Brodowski and Dudley that a police vehicle was parked near the house. (Tr. 11-28-06, 36; Tr. 11-29-06, 8).
>
> When Petitioner and his companions re-appeared in the living room, Petitioner accused Davis of being "the police." (Tr. 11-28-06, 36-38). Petitioner pushed Davis and Davis pushed Petitioner back. (Tr. 11-28-06, 37-38). Davis shoved

---

[2]Petitioner has not filed a brief in support of his habeas application.  Accordingly, in addressing petitioner's claims I rely on petitioner's briefs in the state courts.

Petitioner up against a wall, "trying to tell [Petitioner] that [he] didn't want to fight." (Tr. 11-28-06, 37-38). At this point, Petitioner told Boss Man to "grab the pole." (Tr. 11-28-06, 38). Boss Man picked up a pole and began swinging it at Davis. (Tr. 11-28-06, 38; Exh. 5). Boss Man struck Davis in his left leg several times. (Tr. 11-28-06, 39-40). Boss Man gave the pole to Petitioner, who "[s]tart[ed] swinging it at [Davis]" and striking him in the left leg. (Tr. 11-28-06, 40).

Dudley, in Brodowski''s bedroom, heard a "[c]rash bang." (Tr. 11-29-06, 9). She was "not sure who started the fight or how it broke out," but she observed by peeking out the bedroom that most of Petitioner and his companions "jumped on" Davis. (Tr. 11-29-06, 9-10). Dudley endeavored to exit the house through a bedroom window. (Tr. 11-29-06, 10-11). The bedroom window, however, was locked. (Tr. 11-29-06, 11). Instead, Dudley hid inside a closet. (Tr. 11-29-06, 11). As she did so, Dudley could hear Davis screaming. (Tr. 11-29-06, 12).

One of Petitioner's companions hit Davis in the head with a lamp. (Tr. 11-28-06, 40; Exh. 3). Now on the living room floor, Petitioner and Boss Man began to kick and stomp Davis' head and other parts of his body. (Tr. 11-28-06, 41). They dragged Davis into another bedroom, continuing to assault him. (Tr. 11-28-06, 42-43). Boss Man, using extension cords, tied Davis up as Petitioner, Polo, Eric, and Keith watched. (Tr. 11-28-06, 43-44). He tied Davis' legs and hands, stuffed a shirt in Davis' mouth, and tied another extension cord around Davis' mouth. (Tr. 11-28-06, 43-44). Afterwards, the assailants "kicked and stomped" Davis. (Tr. 11-28-06, 44).

At this point, Polo began to "cut" Davis' chest, arms, and upper body. (Tr. 11-28-06, 45). Petitioner threw rubbing alcohol on Davis' wounds and lit it on fire. (Tr. 11-28-06, 45-47). Boss Man remained in the bedroom and Eric stood by the door. (Tr. 11-28-06, 47). No one made an effort to stop these assaults. (Tr. 11-28-06, 47, 50). Eventually, Polo cut Davis again and Petitioner doused Davis with rubbing alcohol for a second time. (Tr. 11-28-06, 46-47, 50). Boss Man and others continued to "hit" and "kick" Davis. (Tr. 11-28-06, 47-50). Throughout the assault, Davis was screaming in pain and calling for help. (Tr. 11-28-06, 51-52). Davis was in so much pain that he had no idea how long the assault lasted. (Tr. 11-28-06, 49-50). Davis felt as if he were going to die. (Tr. 11-28-06, 50).

Ultimately, Petitioner and his companions left Davis alone in the bedroom. (Tr. 11-28-06, 50-51). With some effort, Davis was able to free himself from the extension cords. (Tr. 11-28-06, 51-52). Davis "lifted up a window that was in the bedroom and went through the window." (Tr. 11-28-06, 52; Exh.1). Outside the house, Petitioner, Polo, and Keith immediately confronted Davis. (Tr. 11-28-06, 53-54). Keith pushed Davis up against the house and Polo "went across [Davis'] neck with a knife." (Tr. 11-28-06, 53-54). The knife, however, did not cause a deep cut on Davis' neck. (Tr. 11-28-06, 54). Davis fell to the ground. (Tr. 11-28-06, 55). His assailants walked away, arguing about whether Polo had "cut [Davis'] throat." (Tr. 11-28-06, 54-55). Davis got up and ran out towards the street.

Davis went across the street and knocked on the front door of one of the houses on the other side of Colleen. (Tr. 11-28-06, 55-56). An occupant answered

the front door and told Davis "to get away from his house." (Tr. 11-28-06, 55-56). Davis approached the house next door and asked a young man at a window to call the police. (Tr. 11-28-06, 56). The young man telephoned the Warren Police Department ("WPD"). (Tr. 11-28-06, 55-56).

Soon, WPD officers arrived on Colleen. (Tr. 11-28-06, 56-57; Tr. 11-29-06, 53-56). Officer Paul Houtos ("Officer Houtos") pulled onto Colleen at the same time as another WPD patrol car. (Tr. 11-29-06, 54-56). He observed Davis "standing on the porch in his underwear" with "a tee shirt around his neck." (Tr. 11-29-06, 55-56). Davis was hunched over and Officer Houtos asked him if he was okay. (Tr. 11-29-06, 56). On closer inspection, Officer Houtos saw that Davis was "doubled over in pain." (Tr. 11-29-06, 57).

Davis had difficulty speaking with the WPD officers due to his injuries, but Brodowski talked with them about what had happened inside his house and permitted them to look around the house. (Tr. 11-28-06, 57; Tr. 11-29-06, 58-65). Brodowski gave Officer Houtos "street names" of the individuals who had been present at this house on June 4. (Tr. 11-29-06, 6-66).

WPD Officer Ronald Visbara ("Officer Visbara"), an evidence technician, arrived at Brodowski's house moments after Officer Houtos. (Tr. 11-29-06, 11-14). Officer Visbara viewed Davis "sitting on [the] porch" with "numerous cuts on his body." (Tr. 11-29-06, 14-15). Davis had "a shirt that was ripped and extremely bloody." (Tr. 11-29-06, 14-15). He "had some extension cords around his neck." (Tr. 11-29-06, 14-15). Emergency medical personnel from the Warren Fire Department arrived on Colleen Street and began to treat Davis. (Tr. 11-29-06, 15).

Officer Visbara took the extension cords that had been around Davis' neck into evidence. (Tr. 11-30-06, 15-19). One extension cord was "a 12-foot green cord" and the other extension cord was "an 18-inch black cord." (Tr. 11-30-06, 15-18). In Brodowski's house, Officer Visbara later recovered a third extension cord, "a 6-foot white cord" covered in blood. (Tr. 11-30-06, 15-18, 24-25; Exhs. 16, 19). Inside the house, Officer Visbara observed the signs of a struggle in the living room. (Tr. 11-30-06, 21; Exh. 17, 18). Lying on a dresser in the bedroom in which Davis had been assaulted, Officer Visbara found a kitchen knife with a 9½-inch metal blade and a 5-inch blue plastic handle. (Tr. 11-30-06, 22; Exhs. 2, 15, 20). Also in the bedroom, Officer Visbara recovered "a plastic 16-ounce empty bottle that once contained liquid alcohol." (Tr. 11-30-06, 31-32; Exh. 21). The bottle was covered with what appeared to be dried blood. (Tr. 11-30-06, 32-33).

An ambulance took Davis to nearby Bi-County Hospital. (Tr. 11-28-06, 57, 60; Tr. 11-29-06, 58). In the ambulance, Officer Visbara took photographs of Davis' injuries. (Tr. 11-28-06, 60-64; Tr. 11-20-06, 30-31; Exh. 6, 10). Officer Houtos spoke with a more communicative Davis at the hospital. (Tr. 11-29-06, 66-67). Davis spent "[a] couple days" at the hospital. (Tr. 11-28-06, 60). As it turned out, Davis sustained broken bones in his left leg and left index finger. (Tr. 11-28-06, 65).

On the morning of June 5, 2006, the WPD assigned Detective Daniel Klik ("Detective Klik") to investigate the assault upon Davis. (Tr. 11-29-06, 73-75). Based on Officer Houtos' discussion with Brodowski, Detective Klik possessed only

"street names" of Davis' assailants. (Tr. 11-29-06, 76). Detective Klik traveled to Colleen and spoke to Brodowski, learning that "[t]here were items that were left at the home that hadn't been collected the previous evening." (Tr. 11-29-06, 79-80). Detective Klik subsequently dispatched WPD Officer Robert Schaffner ("Officer Schaffner"), an evidence technician, to process Brodowski's house for evidence related to the assault upon Davis. (Tr. 11-29-06, 30-32, 80-81). Brodowski let Officer Schaffner inside the house. (Tr. 11-29-06, 32-33). Officer Schaffner recovered two lamps. (Tr. 11-29-06, 33-34; Exhs. 9, 12). One lamp "was missing the cord." (Tr. 11-29-06, 34-35). Officer Schaffner also recovered "a galvanized steel pipe, approximately one and half inches in diameter, three to four feet long." (Tr. 11-29-06, 37-38; Exh. 13). Further, he located "a blue handled serrated knife approximately 13 inches in length." (Tr. 11-29-06, 39; Exh. 14). Officer Schaffner took photographs of all the two lamps, the lead pipe, and the knife. (Tr. 11-29-06, 41-42; Exhs. 3, 5).

Detective Klik, meanwhile, drove to Bi-County Hospital and spoke with a "groggy" Davis. (Tr. 11-29-06, 81-82). Hospital physicians had given Davis morphine to alleviate the pain associated with the burns and broken bones. (Tr. 11-29-06, 81-82). At the hospital, Detective Klik also spoke with Davis' girlfriend, Bonnie Hodges. (Tr. 11-29-06, 82-83, 90-91).

Upon returning to the police station that afternoon, Detective Klik endeavored "to ascertain the true identification of [Davis' assailants]." (Tr. 11-29-06, 91). Based on information developed by Detective Klik, Lieutenant Glenn Brymer ("Lieutenant Brymer"), with help from WPD patrol officers, apprehended Petitioner in the area of Eight Mile and Groesbeck in Detroit. (Tr. 11-29-06, 95-96; Tr. 11-30-06, 42-46). Back at the police station, Lieutenant Brymer read Petitioner the *Miranda* warnings and Petitioner waived his rights. (Tr. 11-30-06, 47-48). Lieutenant Brymer subsequently interrogated Petitioner about his involvement in the assault upon Davis. (Tr. 11-30-06, 47-51).

Detective Klik also spoke with Petitioner inside the police station. (Tr. 11-29-06, 95-96). Detective Klik again gave Petitioner the *Miranda* warnings and Petitioner agreed to an interview. (Tr. 11-29-06, 96). Petitioner's account of the previous evening's events on Colleen "changed several times." (Tr. 11-29-06, 97). At first, Petitioner denied being present for the assault upon Davis. (Tr. 11-29-06, 99-100). By the conclusion of interview, Petitioner was portraying himself as actually rescuing Davis from the assault. (Tr. 11-29-06, 97-100).

Answer, at 3-8.

C.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535

U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*,

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.

However, "[i]n order for a federal court to find a state court's application of [Supreme Court]

precedent 'unreasonable,' the state court's decision must have been more than incorrect or

erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Evidentiary Issues (Claims I-III)*

9

Petitioner's first three claims raise various evidentiary issues. In Claims I and III, petitioner contends that he was denied a fair trial by the introduction of, respectively, evidence that he had outstanding arrest warrants and photographs of the victim's injuries. In Claim II, petitioner contends that he was denied his right to a fair trial by the prosecutor's failure to produce a *res gestae* witness and the trial court's failure to give an adverse inference instruction. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Admission of Other Acts and Photographs (Claims I & III)*

a. *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny

10

the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994). In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

### b. Analysis

Petitioner contends that he was denied a fair trial by the introduction of evidence that, at the time of his arrest, he had two outstanding warrants. At trial, Lieutenant Glenn Brymer testified that he arrested petitioner at a Detroit party store. In response to an open-ended question from the prosecutor, Brymer testified that after he arrested petitioner "[w]e put his name through the Michigan LEIN system, located two warrants for his arrest, one out of the circuit court for Detroit and one out of Roseville . . . district court." Trial Tr., dated 11/30/06, at 45-46. Petitioner is not entitled to habeas relief on this claim, for two reasons. First, as noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction of this evidence. Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington*

*v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974). Second, any error in the introduction of this evidence did not deprive petitioner of a fair trial because, as explained by the Michigan Court of Appeals, *see Robertson*, 2008 WL 2779899, at *1, the admission of the evidence was harmless. The testimony was not solicited by the prosecutor and was not mentioned again during trial. Further, the jury was provided no information regarding the charges for which the warrants had been issued. In light of the overwhelming evidence of petitioner's guilt, including the victim's testimony, the evidence corroborating the victim's account, and petitioner's own inconsistent statements to the police, it is unlikely that the brief mention that petitioner had an outstanding arrest warrant affected the jury's verdict.

Likewise, petitioner cannot show that he was denied a fair trial by the introduction of photographs of the victim's injuries. "The admission of relevant photographs of a crime scene or victim, even if gruesome, does not deprive a criminal defendant of a fair trial." *Skrzycki v. Lafler*, 347 F. Supp. 2d 448, 455 (E.D. Mich. 2004) (Gadola, J.); *see also*, *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997) (admission of gruesome photographs generally does not "raise[] the specter of fundamental unfairness such as to violate federal due process law."); *Pearl v. Cason*, 219 F. Supp. 2d 820, 830 (E.D. Mich. 2002) (Edmunds, J.) ("[A] challenge to the admission of a gruesome photograph does not present a question of constitutional magnitude."); *cf. Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005). Here, the photographs were highly relevant to the case because petitioner was charged with torture pursuant to MICH. COMP. LAWS § 750.85, which provides that "[a] person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her

12

custody or physical control commits torture and is guilty of a felony punishable by imprisonment for life or any term of years." MICH. COMP. LAWS § 750.85(1). The statute further defines "cruel" as "brutal, inhuman, sadistic, or that which torments," MICH. COMP. LAWS § 750.85(2)(a), and defines "great bodily injury" as, *inter alia*, "internal injury, poisoning, serious burns or scalding, severe cuts, or multiple puncture wounds." MICH. COMP. LAWS § 750.85(2)(c)(ii). Given the elements of the crime and its related definitions, the nature and extent of the victim's injuries were highly relevant. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these claims.        2.      *Res Gestae Witness and Adverse Inference Instruction (Claim II)*

Petitioner next contends that he was denied a fair trial by the prosecutor's failure to produce a *res gestae* witness–Roger Brodowski, the owner of the home in which the victim was assaulted–and by the trial court's subsequent failure to instruct the jury that it could draw an adverse inference against the prosecution based on its failure to produce the witness. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Michigan law requires a prosecutor to list all *res gestae* witnesses. *See* MICH. COMP. LAWS §§ 767.40-.40a; *see also, People v. Jones*, 64 Mich. App. 659, 236 N.W.2d 531 (1975); *People v. Anderson*, 64 Mich. App. 218, 235 N.W.2d 746 (1975). Under Michigan law, a *res gestae* witness is "one who was an eyewitness to some event in the continuum of a criminal transaction and whose testimony will aid in developing a full disclosure of the facts surrounding the alleged commission of the charged offense." *People v. Hadley*, 67 Mich. App. 688, 690, 242 N.W.2d 32, 34 (1976). The statute does not, however, require the prosecutor to call all listed witnesses. In any event, any failure of the prosecutor with respect to a *res gestae* witness raises solely a claim of state law. It is well

13

established that errors of state law do not provide a basis for habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Thus, petitioner's claim that the prosecutor violated state law regarding the production of res gestae witnesses is not cognizable on habeas review. *See Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 601 (E.D. Mich. 2001) (Tarnow, J.).

Petitioner does not explicitly argue that the prosecutor's failure to produce these witnesses violated his rights under the Sixth Amendment's Confrontation and Compulsory Process Clauses. Regardless, any such claim would be without merit. The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right…to be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor[.]" U.S. CONST. amend. VI. With respect to the Confrontation Clause, under the Sixth Amendment "[a] defendant has no right to confront a 'witness' who provides no evidence at trial. Nor is the government required to call all of the witnesses to a crime." *United States v. Heck*, 499 F.2d 778, 789 n.9 (9th Cir. 1974) (citations omitted) (internal quotation omitted); *see also, United States v. Bryant*, 461 F.2d 912, 916 (6th Cir. 1972); *United States v. Polisi*, 416 F.2d 573, 579 (2d Cir. 1969); *Mitchell v. United States*, 359 F.2d 833, 836 n.3 (7th Cir. 1966). For this reason, the Sixth Circuit and Judges of this Court have repeatedly found that the prosecution's failure to endorse or call a *res gestae* witness in accordance with Michigan law does not raise a constitutional claim cognizable on habeas review. *See, e.g., Smith v. Elo*, No. 98-1977, 1999 WL 1045877, at *2 (6th Cir. Nov. 8, 1999); *Moreno v. Witbrow*, No. 94-1466, 1995 WL 428407, at No. 94-1466, 1995 WL 428407, at *1 (6th Cir. July 19, 1995) (per curiam); *Lewis v. Jake*, No. 88-1522, 1989 WL 145895, at *3 (6th

14

Cir. Dec. 4, 1989) (per curiam); *Atkins v. Foltz*, No. 87-1341, 1988 WL 87710, at \*2 (6th Cir. Aug. 24, 1988) (per curiam); *Johnson*, 159 F. Supp. 2d at 601.

With respect to the Compulsory Process Clause, as a general matter that Clause "grants a criminal defendant the right to call witnesses that are 'material and favorable to his defense." *Wong v. Money*, 142 F.3d 313, 324 (6th Cir. 1998) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).   Unfortunately, the Supreme Court has provided little guidance on the exact contours of the Compulsory Process Clause.   *See Pennsylvania v. Ritchie*, 480 U.S. 39, 55 & n. 12 (1987) (noting that the Compulsory Process Clause has rarely been a factor in the Court's decisions). Nevertheless, some general principles do exist to guide the Court's determination.   First, as a general matter the clause establishes, "at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Id.* at 56.   Second, it is clear that the right to compulsory process is not absolute; thus, in certain circumstances a witness may be precluded from testifying as a sanction for defendant's failing to comply with a discovery order, *see Taylor v. Illinois*, 484 U.S. 400, 410-14 (1988), and testimony is subject to general evidentiary rules such as those governing relevance and privilege, *see Washington v. Texas*, 388 U.S. 14, 23 n.21 (1967); *Smith v. Cromer*, 159 F.3d 875, 882 (4th Cir. 1998).

Here, petitioner cannot show that he was denied his right to compulsory process for two reasons.   First, as the Supreme Court has explained, "more than mere absence of testimony is necessary to establish a violation of the right [to compulsory process]." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 866 (1982).   The Sixth Amendment does not provide a defendant the right to process for obtaining any witness, only "witnesses in his favor." U.S. CONST. amend. VI.   "This

language suggests that [a defendant] cannot establish a violation of his constitutional right to compulsory process merely by showing that [he was deprived of witnesses' testimony]. He must at least make some plausible showing of how their testimony would have been both material and noncumulative evidence in support of his defense. *See Valenzuela-Bernal*, 458 U.S. at 873 (defendant must show that the evidence "would have been material and favorable in ways not merely cumulative to the testimony of available witnesses."). Petitioner has failed to show what favorable evidence Brodowski would have provided, and thus he cannot show that he was denied his right to compulsory process.

Second, petitioner cannot show a violation of the Sixth Amendment because the Michigan Court of Appeals reasonably concluded that the prosecution had used due diligence in attempting to locate Brodowski. As recounted by the Michigan Court of Appeals:

> Detective Daniel Klik testified at a due diligence hearing that Brodowski had been evicted from his residence two days after the incident. Klik located a second address for Brodowski, who was apparently renting a home, and attempted to serve him with a subpoena on three separate occasions, but Brodowski was never present at the home. Klik talked to Brodowski's neighbors, who were unaware of his location, but informed Klik that the primary renter of the home was Michael Cristini, who had been evicted. Brodowski, who left no forwarding address, was last seen on September 15, 2006, approximately two-and-a-half months before trial commenced. Klik also utilized the assistance of Lieutenant Glen Brymer and his staff, who were also fruitless in their search for Brodowski.

*Robertson*, 2008 WL 2779899, at *2. The Compulsory Process Clause does not guarantee the appearance of any witness; it only requires that the government "exercise due diligence in a good faith effort to secure the attendance of subpoenaed witnesses." *United States v. Baker*, 553 F.2d 1013, 1022 (6th Cir. 1977). Here, the record shows that the police attempted to locate Brodowski at two separate residences. They also attempted to obtain a forwarding address from Brodowski's neighbors. The police were also unable to locate Brodowski's wife or children. *See* Trial Tr., dated

16

11/30/06, at 62-66.  In light of this evidence, the Michigan Court of Appeals reasonably concluded that the police had exercised due diligence in attempting to locate Brodowski for trial.  Thus, petitioner cannot show that he was denied his right to compulsory process.  And, for the same reason, petitioner cannot show that he was entitled to an adverse witness instruction under state law.  *See People v. Eccles*, 260 Mich. App. 379, 389, 677 N.W.2d 76, 83 (2004) (missing witness instruction appropriate where prosecutor fails to exercise due diligence).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Prosecutorial Misconduct (Claim IV)*

        Petitioner next contends that he was denied a fair trial by the prosecutor's improper comment during opening statement.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.[3]

        1.      *Clearly Established Law*

        For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (internal quotation omitted).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability

---

[3]Respondent contends that this claim, as well as petitioner's jury oath and sentencing claims, are barred by petitioner's procedural default in the state courts–namely, his failure to object at trial.  Because these claims are clearly without merit, the court may reject the claim on the merits without resolving the procedural default issue.  *See Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis because resolution of the default issue would require remand and further judicial proceedings); *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted) (while procedural issues in a habeas case should ordinarily be resolved first, "judicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated.").

of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

2.      *Analysis*

Petitioner contends that the prosecutor committed misconduct by stating during opening statement that the evidence would show that "[a]t some point in time Bishop Davis got himself untied and slipped out the window, where he was confronted outside by a few of the individuals and had his throat cut." Trial Tr., dated 11/28/06, at 7. Petitioner contends that the prosecutor knew he could not prove this fact because Bishop testified at the preliminary examination that although someone drew the knife across his throat, no blood was drawn. *See* Prelim. Exam. Tr., at 69. However, the prosecutor's statement was a fair inference of what he, in good faith, believed the evidence would show. As the Michigan Court of Appeals explained, the victim's testimony at the preliminary examination that the knife "went across" his throat "could lead someone to believe that his neck was actually cut." *Robertson*, 2008 WL 2779899, at *3. Further, notwithstanding the victim's testimony at the preliminary examination that no blood was drawn, the victim "also described making gargling sounds and falling down after the knife went across his throat," and "the victim's neck appear[ed] to be injured in photographs taken of the victim after incident." *Id.*; *see*

18

*also*, Prelim. Exam. Tr., at 52. Further, at trial the victim testified that the knife did cause a wound, albeit not a very deep one. *See* Trial Tr., dated 11/28/06, at 54. A prosecutor does not commit misconduct by referring during opening statement to evidence the prosecutor intends to introduce and which in good faith he believes is admissible. *See United States v. Chirinos*, 112 F.3d 1089, 1098 (11th Cir. 1997). Because the prosecutor's statement was in general consistent with what he believed the evidence would show, and with what the evidence in fact showed, petitioner cannot establish that the prosecutor's comment was improper.

Further, even assuming that the opening statement was improper, petitioner cannot show that he was denied a fair trial, because the court instructed the jury that the prosecutor's opening statement was not evidence. *See* Trial Tr., dated 11/28/06, at 4. In *Frazier v. Cupp*, 394 U.S. 731 (1969), the petitioner argued that the prosecutor's reference to a coconspirator's confession during opening statement deprived him of his right to confront the witnesses against him when the coconspirator invoked his right to remain silent and did not testify. The Supreme Court found that the trial court's instruction that the prosecutor's opening statement was not evidence cured any possible prejudice:

> It may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable. But here we have no more than an objective summary of evidence which the prosecutor reasonably expected to produce. Many things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance. Certainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given. Even if it is unreasonable to assume that a jury can disregard a coconspirator's statement when introduced against one of two joint codefendants, it does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial.

*Id*. at 736. Here, as in *Frazier*, the prosecutor gave an objective summary of the evidence he

19

expected to produced and the trial court instructed the jury that the statements and arguments of the prosecutor were not evidence. This case is thus nearly identical to *Frazier*, and petitioner cannot show that he was denied a fair trial by the prosecutor's opening statement comment. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Jury Oath (Claim V)*

Petitioner next contends that he was denied a fair trial by the trial court's failure to swear in the jury venire prior to *voir dire*. Although the jury that was actually selected was sworn, *see* Trial Tr., dated 11/22/06, at 24, the panel from which the jury was selected was not sworn prior to *voir dire*, as required by Mich. Ct. R. 6.412(B). The Michigan Court of Appeals rejected petitioner's argument that this constituted a structural error, and concluded that petitioner has failed to establish prejudice. *See Robertson*, 2008 WL 2779899, at *3-*4. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

The trial court's failure to comply with Rule 6.412(B) does not present a claim cognizable on habeas review. It is well established that habeas review does not lie for errors of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Thus, the court's failure to comply with Rule 6.412 does not in itself provide a basis for habeas relief. *See Spearman v. Birkett*, No. 05-40006, 2006 WL 6032120, at *12 (E.D. Mich. Mar. 31, 2006). Nor is petitioner entitled to relief on the basis that the failure of the trial court to swear the jury venire prior to *voir dire* violated his right to due process of law. Petitioner has failed to cite, and I have been unable to locate, a single case holding that the federal Constitution requires a trial court to swear a jury venire prior to *voir dire*, much less one holding that a failure to do so constitutes a structural error. Thus, the Michigan Court of Appeals's determinations that the failure of the judge to swear the jury prior to *voir dire* was not a structural

20

error and that petitioner had failed to demonstrate prejudice were nor contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.     *Habitual Offender Sentencing (Claim VI)*

Petitioner next contends that the trial court's amendment of his judgment of sentence to reflect that he had been sentenced as an habitual offender violated his rights under the Double Jeopardy Clause. As explained by the court of appeals, the prosecutor filed an habitual offender notice prior to trial, and the presentence report classified petitioner as an habitual offender and recommended that he be sentenced as such an offender. Further, the trial court's sentence of 5-15 years' imprisonment on the assault conviction could only have been entered if the trial court sentenced petitioner as an habitual offender. *See Robertson*, 2008 WL 7889899, at *4. The written judgment of sentence, however, did not specifically note that petitioner was sentenced as an habitual offender. The trial court therefore entered an amended judgment of sentence, which differed from the original judgment only in its notation of the fact that the sentence was an habitual offender sentence. The Michigan Court of Appeals concluded that "[t]he omission of this fact [of petitioner's sentencing as an habitual offender] from the original Judgment of Sentence was mere clerical error," *Robertson*, 2008 WL 2779899, at *4, and that the trial court therefore had the power to correct the error pursuant to MICH. CT. R. 6.435(A). The Court should conclude that petitioner is not entitled to habeas relief on this claim.

The Michigan Court of Appeals's conclusion that the amended judgment of sentence merely corrected a clerical error was reasonable. The parties and the court were well aware that petitioner was an habitual offender, and proceeded on that basis. The prosecutor had filed an habitual offender

21

notice, the presentence report treated petitioner as an habitual offender, and the trial court's original sentence was imposed on the basis of petitioner being an habitual offender. The amended judgment of sentence did not in any way alter the sentence imposed on petitioner in the court's oral pronouncement of sentence or the original written judgment of sentence. It merely corrected what was obvious to all involved but what had been omitted from the original written judgment of sentence–namely, the fact that petitioner's sentence was an habitual offender sentence. And because the amended judgment of sentence merely corrected a clerical error but did not alter the actual term of imprisonment, the trial court's action neither deprived petitioner of a fair sentencing proceeding nor violated the Double Jeopardy Clause. *See McMannis v. Eberlin*, No. 5:07-CV-255, 2007 WL 3129738, at *2 (N.D. Ohio Sept. 06, 2007); *Wray v. Ward*, No. 03-CV-067, 2007 WL 1822388, at *5 (N.D. Okla. June 22, 2007); *Ervin v. Beyer*, 716 F. Supp. 163, 165-66 (D.N.J. 1989); *cf. Bozza v. United States*, 330 U.S. 160, 166-67 (1947). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.    *Cumulative Error (Claim VII)*

    Finally, petitioner contends that he is entitled to habeas relief based on the cumulative effect of the errors at his trial. The Court should conclude that petitioner is not entitled to habeas relief on this basis. It is true that "[e]rrors which standing alone may be deemed harmless or insufficiently prejudicial to amount to a denial of due process may cumulatively produce a trial setting which is fundamentally unfair." *Payne v. Janasz*, 711 F.2d 1305, 1316 (6th Cir. 1983) (Jones, J., dissenting); *accord Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983). This rule, however, applies only to constitutional errors; the accumulation of non-errors cannot collectively amount to a violation of due process. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *United States v. Lumpkin*, 192

F.3d 280, 290 (2d Cir. 1999); *McKinnon v. Ohio*, No. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995); *Fero v. Kerby*, 39 F.3d 1462, 1475 (10th Cir. 1994). As noted and discussed in this Report, none of petitioner's claims establish constitutional error, and thus his cumulative error claim fails.

I.     *Recommendation Regarding Certificate of Appealability*

       1.     *Legal Standard*

       As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893

23

n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.   *Analysis*

If the Court accepts my conclusion regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability, for the reasons discussed above.  No clearly established law prevents the admission at trial of gruesome photographs or prior bad acts, and in any event the photographs were highly relevant and the evidence of the bare fact that petitioner had outstanding arrest warrants was not prejudicial in light of the evidence presented at trial.  Further, because the prosecutor used due diligence in attempting to locate the

24

endorsed witness, petitioner was clearly not denied his right to compulsory process, and any failure of the prosecutor to comply with the *res gestae* witness statute does not raise a claim cognizable on habeas review. Thus, the resolution of petitioner's evidentiary claims is not reasonably debatable. Likewise, the record establishes that the prosecutor's comment during opening statement was consistent with the evidence, and in any event petitioner cannot show that he was prejudiced in light of the trial court's explicit instruction that the prosecutor's opening statement was not evidence. Thus, the resolution of petitioner's prosecutorial misconduct claim is not reasonably debatable. Because there is no clearly established federal law requiring a trial court to administer an oath to the jury venire prior to *voir dire*, the resolution of this claim is not reasonably debatable. With respect to petitioner's double jeopardy claim, because it is clear that the amended judgment of sentence did not alter petitioner's punishment but merely corrected a clerical error, the resolution of this claim is not reasonably debatable. Finally, because petitioner has failed to establish any constitutional violation, the resolution of his cumulative error claim is not reasonably debatable. Accordingly, the Court should deny petitioner a certificate of appealability.

J.      *Conclusion*

        In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

        The parties to this action may object to and seek review of this Report and Recommendation,

25

but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: June 20, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 20, 2011.

s/Susan Jefferson
Deputy Clerk

26